Our first case of the afternoon, Crossroads Ford v. Sterling Truck Corporation, 410-0204. For the appellant, Mr. Smith, for the athlete, Mr. Christensen, you may proceed. Thank you, your honor. May it please the court. My name is Gary Smith and I represent Crossroads Ford. This is a case of first impression involving the question of whether or not a dealer can plead a cause of action for rebranding under the Motor Vehicle Franchise Act. The case comes on 2615, a motion to dismiss that the court granted, dismissing 12 of Crossroads' counts below. Crossroads has alleged in its complaint, amended complaint, that defendants will continue to manufacture Sterling-type vehicles but rebrand them under another name without good cause in violation of Section 4D-6 of the Motor Vehicle Franchise Act. Count 1 also alleges that this conduct violated Section 4D-1 by arbitrarily and capriciously reallocating vehicles from Sterling dealers to other dealers controlled by Daimler Trucks North America under the Freightliner or Western Star brands. On October 14, 2008, Daimler Trucks North America, referred to shorthandedly here as DTNA, sent a letter to Crossroads and other Sterling dealers in which DTNA announced that Sterling would stop the manufacturing of Sterling-type trucks in March of 2009 due to product overlap, that is to say, similar products between Sterling-type trucks and other DTNA products, Western Star or Freightliner. Also in that notice, DTNA indicated that Crossroads' franchise will be terminated, that it will receive formal notice of termination at a later date and receive repurchase assistance. Repurchase assistance is a term used for compensating a dealer upon termination of his franchise. Also on that October 14, 2008 date, DTNA filed an announcement with the Securities and Exchange Commission in which DTNA indicated that it was adopting a two-brand strategy, cease to manufacture Sterling-type trucks, but DTNA indicated that vehicle additions to Freightliner and Western Star product brands would be made for those markets that were exclusively served by Sterling-type trucks. So Crossroads essentially alleged in the early accounts of its complaint that defendants will continue to manufacture Sterling-type trucks but relabel them under a different name. And the key statute that I think is the heart of the first three counts anyway involves Section 4D6, Big D, of the Act that gives the manufacturer a good cause to cancel or terminate a franchise if the manufacturer permanently discontinues the manufacture or assembly of motor vehicles of such line make. Now the Circuit Court below interpreted that language to mean that once defendants stopped using the Sterling label, even if they continued to manufacture the same types or similar types of trucks and relabel them, amounted to good cause under the statute. On appeal, we contend that the Court was wrong for several reasons. First of all, that language in 4D6D refers to the manufacture or assembling of motor vehicles, and the Court placed undue emphasis on the term line make. The verb here has to do with the manufacturing of the vehicles, not manufacturing of a brand name or line make. A Sterling vehicle is still that same type of vehicle, even if you just take the hood ornament off of it and you plaster a Freightliner or a Western Star on it. It's like a shell game. Now obviously we have to take the pleadings as true for purposes of motion on this appeal. So obviously there's proof problems later on, but the burden of proof that the statute provides is on the manufacturer to establish good cause. So taking the allegations and the complaint as true, we're alleging that there will be rebranding and a continuing of the manufacturing of those vehicles due to the statement by DT&A that there's product overlap between Sterling and other DT&A products, and the statement to the SEC that DT&A will make additions in the future to Freightliner and Western Star product lines that were exclusively handled by Sterling. In other words, there's a shifting basically here of the products that were Sterling-type dealers, crossroads handled, to other companies that DT&A owns and controls, Freightliner and Western Star, and that that is a violation of the Act. Didn't General Motors pretty much do the same thing when they discontinued Pontiac? Not that I'm aware of, Judge. I mean, there have been other situations where other dealers, I'm sorry, where other manufacturers have discontinued other lines, but not in the same vein here. I mean, I don't think there's any case like this anywhere else in the country that I can find. Well, actually, there isn't another state with a statute that has the 4D, 6D good cause definition that we have here. So, I don't find, I'm not aware of anything else where that has occurred before. What is it that the dealer would need to do to accomplish what they wanted to accomplish? The manufacturer? Yeah. You mean, what would they need to do? Well, I mean, I would assume we could very well be a business decision to discontinue a line. Correct. It could be a business decision that made sense to them for whatever reason to rebrand something. Same chat, you know, however you would express it. It's almost the same, but there are differences. So, what do they need to do in regard to their dealers to accomplish that without running afoul of the Illinois law? Well, they can't. They have to compensate their dealers. They made the business decision in setting up this network. They made this business decision in getting the dealers to invest in the dealership business. So, once they've set up this network of their own and they've created this product overlap, they've decided that they want to stay in this type of line, they will have to compensate the dealers. Or, alternatively, they just stop making that type of truck altogether. But in this case, we've pled and taken exhibits from their own statements that they're not abandoning this market. They've told their shareholders through their SEC announcement, we're still going to go after those type of markets for the type of truck that was exclusively handled by Crossroads. We're going to stick in that and we're going to put those product additions over here in another brand name, Western Star or Sterling. So, once the manufacturer sets up this network and gets its dealers to invest, it either has to abandon those markets altogether or compensate the dealer for terminating the franchise, compensation under Section 9. So, I think those are the alternatives. What was selected here was sort of an economic erosion. Initially, in this October 14, 2008 announcement, DTNA, not Sterling, but the mother company, DTNA, indicated to its dealers that it was going to continue in this marketplace, but essentially shift these kind of trucks to other dealers. And that operates to the detriment of Sterling dealers and to the benefit of other Freightliner dealers. Evidently, DTNA felt some decision, some business need to stay in that market. And if they're going to stay in that market, they're going to have to pay the freight for setting it up the way they have. It's our position that the court interpreted the language in 4D, 6D, erroneously for the reason that that statute requires that the defendants, the manufacturers, permanently cease the manufacturing of the trucks. And it's that permanently that runs contrary to rebranding. So, the defendants have not, you know, the defendants under the allegations in the complaint have not afforded themselves the benefit of that good cause definition in 4D, 6D. There must have been some reason for the legislature to have included the word permanently in that definition of good cause. Effectively, the circuit court interpreted that language to say that good cause consists of no longer using the brand name. And that's not what 4D, 6, Big D says. It says it has to permanently, the manufacturer has to permanently stop the manufacturing of those type of vehicles. And if they're going to continue it under another name, that's just a shell game. And it's an abuse, runs contrary to the policy of the Motor Vehicle Franchise Act. I mean, the Act is there in part to protect dealers from manufacturer abuse. Manufacturers... Counselors, defendants argue that this court doesn't have jurisdiction to determine good cause. And that question is left for the review board. What's your response? Well, they've argued, the court never ruled on that below. They've argued that the motor vehicle review board has exclusive jurisdiction to hear the case. And that's wrong for the reasons that there's concurrent jurisdiction and that the race judicata would prohibit the piecemeal approach that you have suggested. I think your question goes a little bit deeper than that when it refers to the Fields case and talks about the circuit court determining good cause. It appears under Section 13 that the court has jurisdiction to award damages. That's explicitly in there. And if there is a defect or some limitation on the circuit court hearing good cause, then primary jurisdiction is the resolution of that situation where the circuit court would take the liability issue, refer it down to the administrative agency while still keeping jurisdiction of the case. Then the administrative agency could decide the merits of the good cause. And assuming that crossroads or the dealer prevails, then the circuit court could award damages. But there's no way that a dealer can get damages for a violation of the Motor Vehicle Franchise Act by taking the case to the Motor Vehicle Review Board. The administrative agency simply does not have that authority and it's limited by what's in the act. So although I think the circuit court could determine good cause, if this court finds that there is such a limitation, I think primary jurisdiction is the way to interpret the various statutes at play in the Motor Vehicle Franchise Act in a harmonious or concurrent way. The court's decision below was also inconsistent with the definition of good cause in the Motor Vehicle Franchise Act, which in Section 2 essentially defines good cause as commercial reasonableness under the General Motors decision, the Supreme Court's decision in General Motors. Rebranding here, as alleged, serves no valid commercial purpose other than to destroy the Sterling dealer network and shift that type of vehicle over to the Western Star or Freightliner dealer network that DT&A now favors. We think for all those reasons the court below misinterpreted and misconstrued the definition of good cause in Section 4D60. But the court erred for another very important reason. The complaint alleges that the manufacturers have violated Section 4D1, which prohibits arbitrary and malicious allocation of motor vehicles among dealers. And that's essentially what's happening here. The court's order below didn't address Section 4D1. It's silent on that matter. But the allegations clearly show that if there's a rebranding and a continuing to manufacture of the same type of vehicles, it's a shifting from one type of dealer, Sterling dealers, to other types of dealers, either Western Star or Freightliner, and that that's a violation of the Act. One could look at 4D1 and say, well, that allocation of vehicles is only within the same type of franchise, meaning only within Sterling type dealers and not transferring from one type to the other. I disagree with that reading of it. But clearly the policy expressed by the legislature in prohibiting this allocation in an arbitrary manner would also run afoul of rebranding, which is about as an egregious type of reallocation as you can get by trying to take away all of the new vehicles that a Sterling type dealer would have and shift them over to the more favored Western Star or Freightliner type of dealerships that still survive and that will be handling this product overlap or the additions to the network that were previously handled exclusively by Sterling. We've alleged other counts in our complaint, mostly having to do with the amendment to the Motor Vehicle Franchise Act that was effective in May of 2009. We think the court has erroneously ruled on all of those because we believe we've sufficiently alleged a valid cause of action in each of those counts for post-termination after May 22, 2009. The manufacturer here or the defendants here claim that there's no termination. That's their mantra. No termination, no termination. And termination is not an element of the cause of action in this case. And therefore, it's not really a consideration yet. But termination will occur and what we have here is essentially an economic erosion, a slow economic erosion, where the manufacturer has taken away the ability to sell new trucks to Sterling dealers, to Crossroads, and just let them wither sort of on the vine without the ability to get new trucks and remain in viable business, while those new trucks are shifted to a different type of brand name under the control of DTNA. We pray that the court enter an order reversing and remanding this case to the Circuit Court on all counts. Thank you, Counsel. We'll hear from you on rebellion. Counsel, may it please the Court, John Christensen for the defendants. There are five or six key facts that I think drive the resolution of this case. One was that, and these are taken from the complaint, or are facts of which this Court can take judicial notice. Until March of 2009, Sterling Truck was a manufacturer of heavy-duty commercial trucks. And on October 14th, it made the announcement that it was ceasing the manufacture of those trucks, not just for what Mr. Smith says was product overlap, but rather for the depressed demand for trucks, as alleged in the complaint and the attachments. Each of the agreements with the Sterling dealers, including Crossroads, contained a contractual provision expressly permitting Sterling to cease the manufacture of any or all of its models of trucks. On November 24th, 2008, as attached to the complaint, there was a letter sent by Sterling and Daimler saying that the sales and service agreement would continue if the dealer elected not to accept the package that was offered to them in exchange for a release. Since that time, the body of facts that we operate under is that Crossroads has stayed in business, doing parts and service work, and as alleged in the complaint, even bought 12 more trucks in the summer of 2009 after Sterling stopped manufacturing in March of 2009 from what was called Sterling's corporate inventory, and those 12 trucks were sold to the public. For the first time, I have heard Mr. Smith say that termination is not alleged in this case, because if you read the complaint, there is an allegation that Crossroads was terminated as a Sterling dealer when Sterling ceased the manufacturing of its trucks in March of 2009, and so it now says there was a termination, and there was not a termination, although it's alleged in the complaint there was a termination, and it seems to me that although a party can allege inconsistent theories, they can't allege inconsistent facts that the light was green, but the light was also red. So we have to take them at what he's saying today, that they're not alleging termination, and if they're not alleging a termination, then this case becomes, I think, a whole lot simpler, but that's just not what the complaint says. It had three cracks at the complaint, and it still remains what I would refer to as a Serbonian bog, which is an ancient Egypt, a marsh that sand blew over and swallowed up entire armies. I apologize for the length of my brief, but it was simply necessary to address all the issues that were advanced in the complaint and on appeal. I want to start with subject matter jurisdiction, and this is a matter that did not occur to me below, until I read the Clark Investments case in the course of preparing our appeal brief, and fortunately for me, subject matter jurisdiction is not waived. And we start with the Fields decision, which said that in a case not involving termination, but involving the addition of another franchise, so-called ad point statute of the Franchise Act, because the district court, the trial court, was being asked to address facts that essentially were administrative or legislative in nature, then the court could not properly exercise jurisdiction that was unconstitutional because of the separation of powers. So in the light of the Fields decision, the legislature went back to work and amended the statute to create the board, give it jurisdiction over certain kinds of cases, and then describe what would be good cause for termination in Section 12D, what would be good cause for adding another dealer in 12C. And so there was an elaborate administrative remedy created in harmony with the dealer's ability for cases other than 12D or 4D6 and 4D8 to go to court in a claim not for monetary damages, and it also kept the provisions, although amended of Section 13, that allowed the dealer a remedy for damages. That statute is not a paragon of clarity, and the problem is how to interpret it, given what the legislature was attempting to do after the Fields case. Section 12E is one of the guidelines that gives us the direction that I think leads us to the view that if the dealer has a beef with a termination notice, they are then obliged to file a protest with the board if they wish to enjoin or challenge the termination. Very clearly, the statute provides that if a protest is filed, then the termination doesn't go forward. There is an administrative injunction, if you will. So there's a salutary effect of having the dealers go and file a protest because the harm and damages are thus avoided because no termination occurs. The manufacturer gives a notice, the termination is enjoined by virtue of the filing of the protest, the board resolves the matter, and the manufacturer either has good cause to terminate, in which case it's game over, or the manufacturer is enjoined by the board's order from terminating. So termination cases involving damages would be exceedingly rare because the dealer would be permitted the opportunity to file a protest and thus eliminate the damages or prevent the damages would be a better way to say it. Crossroads did that here. It filed a protest, but then it dismissed the protest in order to file this claim for damages. I'm not entirely sure why that was, but perhaps it's because even Mr. Smith, as regular counsel for dealers, couldn't contemplate the board ordering Sterling to reopen its factories in order to continue to supply trucks to the Sterling dealers. The question here is one of statutory construction, not constitutional challenge by my client. Does the revised statute permit a dealer to sue for damages right away, or must they go before the board to file the protest? And I agree with Mr. Smith that there would be a res judicata effect, provided the causes of action lined up, so that if the dealer filed a protest and prevailed, and the manufacturer somehow failed to honor the injunctive effect of the board's decision and created damages to the dealer, then there would be a statute for damages. But what we are saying is, as the dissent said in Clark Investments, in construing these statutes, we keep field in mind in order to avoid a construction of the statute that creates the constitutional problem. If you were to disagree with me and send this case back to Judge Kelly, and he will have to apply the definition of good cause under section 12D of the statute, one of the factors of which is whether it's in the public interest, and that's exactly the point that the fields court said was in legislative or administrative decision. And Mr. Smith attempts to get around that by saying, no, no, no. If we're in the circuit court, then you look at the good cause definition, the general one of section 2V of the statute, which talks about commercial reasonableness. But if you read the statute in section 12D, it gives a laundry list of things that one looks to, the board looks to, in determining whether or not good cause exists for termination. Among them were the public interest and the amount of business available, the amount of business transacted, whether the dealer complied with their contractual requirements, and a number of other requirements. It would make no sense, from a statutory interpretation standpoint, to say that we are going to have one definition of good cause for termination before the board, and a different definition of good cause for termination in a damages action in the circuit court. The legislature could not possibly have intended that, but they are harmonized if the dealer is required to go to the board in order to challenge termination. It can't be a question of primary or concurrent jurisdiction, as Mr. Smith alleges here, because, in my view, if the statute is interpreted in a way that would permit him to go to the circuit court for damages directly, that would run afoul of the field's prohibitions, and the circuit court would not have jurisdiction at all. Not primary or concurrent jurisdiction. Mr. Smith posits that the circuit court could keep jurisdiction, and then refer to the matter to the board for determination in an attempt to keep his claim alive, but if the statute is interpreted as I suggest it should be, then there is no subject matter jurisdiction, and there would be no jurisdiction for Judge Kelly to keep, because he didn't have it in the first place. So there could be no referral and retained jurisdiction. Now, if you disagree with me on that, then the argument is that Sterling did not violate the statute, and Judge Kelly, if he had the subject matter jurisdiction to determine this, ruled correctly. But we also have preserved, I believe, the arguments that Judge Kelly did not rule upon, the most important of which, in my view, is that there was no termination. You cannot have a termination violation, you can't have an allegation of improper notice of termination, or a lack of notice of termination, if there's no termination to begin with. Judge Kelly assumed, for the purposes of decision, that there was a termination, but my argument to the court today is that there is no, on the basis of this complaint, we can determine that there has been no statutory termination that would trigger a violation of the statute. It could trigger a statutory violation, either by lack of notice, or by a termination itself. Sterling, excuse me, Crossroads concedes these points in its briefing. Number one, that the November 24th letter told Crossroads that there would be no termination. Number two, that it purchased vehicles from Sterling in 2009, a dozen of them, and sold them to the public out of Sterling's corporate inventory. Number three, that it has continued in the parts and service business. Now, one of the points not taken up by Mr. Smith is my request that the circuit court take judicial notice of the fact that Crossroads was in business by virtue of their website. I believe this court can take judicial notice of that on a 2615 motion, and there has been no objection to that by Mr. Smith in his opposition, so I believe that, in fact, that any evidentiary objection would be waived. The definition of a franchise which is supposedly being terminated, or there's a lack of a notice of termination, is pretty specific under 710-2i of the Act, and it says that it involves an agreement to sell motor vehicles or service. So either one constitutes the definition of a franchise. It doesn't seem to be a dispute that, in this case, Crossroads, as a Ford dealer, can still stay in business and can do parts and service work and warranty work for Sterling. There then has been no termination of the franchise agreement. Without a termination, there's no violation. We had another case up in Vermont, the district court, in the L&B case, a statute somewhat similar to the Illinois statute, although without the manufacturer's discontinuance specific provision, and the court there said that Sterling's actions do not constitute a termination of the sales and service agreement, and that's the same conclusion I'm asking under these facts the court to make. Mr. Smith seems to suggest that he is not arguing there was a constructive termination, the so-called death of a thousand cuts, but rather there was a constructive notice of termination. I don't understand constructive notice of termination. Either there was a termination or there wasn't, and either there was a notice or there wasn't. But there could be, in a different case, an allegation that the manufacturer's cessation of manufacturing worked such a hardship on a dealer that even though there wasn't a formal termination, there was a constructive or actual termination. But that's not pleaded here, and the Max Schell case decided by the United States Supreme Court, albeit under the Petroleum Marketing Practices Act, suggests that as long as you continue in business and use the manufacturer's trademark, it can't be a constructive termination. In America today, there has to be some right on the part of a manufacturer where it's consistent with the manufacturer's contract to stop manufacturing its vehicles. If I'm wrong on that and there was a termination, then we get to the reason that Judge Kelly ruled for us, and that was that the termination would still be permitted under 4D60, which allows a manufacturer to have good cause for a termination if they permanently cease the manufacture of vehicles of a particular line. Crossroads' response is that there was rebranding, and they do specifically allege this in their complaint. There was a rebranding that sterling-type vehicles, and that's important, sterling-type vehicles, not sterling vehicles, but sterling-type vehicles will be made by DTNA and sold to Freightliner and Western Star dealers. Here, as you see in my brief, I have made the argument that we have to deal with the evidentiary facts versus the conclusions that Mr. Smith has pleaded. And the evidentiary facts are none other than the attachments to the complaint, which were the Daimler AG securities and exchange filing and the content of the October 14, 2008 letter from Daimler to Crossroads. And neither of those says anything that could be construed without doing violence to the English language to the effect that the same trucks that Sterling was making for Crossroads were now going to be sold by Freightliner and Western Star dealers. Judge Kelly didn't reach that decision either. He said, I don't care about that. Even if they were the very same trucks, I'm going to look to the statute and say, so long as the same line make is not sold, vehicles of the same line make are not sold, Section 4D60 still applies. Mr. Smith says, no, we're looking at the wrong part of that sentence, and what you should look at is the vehicles. I say, there's no jurisdiction, there's been no termination, and there's going to be no way that you can interpret the complaint about being rebranding. But if all of that is wrong, then we could still do that without violating the statute because we would have good cause because Sterling vehicles weren't being sold anywhere. And there's no allegation that anybody is manufacturing Sterling vehicles anymore. And if you disagree with that, then I believe we are faced with a constitutional question of whether or not the Dormant Commerce Clause to the United States Constitution would be offended by the exercise of the judicial power of the state of Illinois to force Sterling to either stay in business or to pay what amounts to an exit tax to dealers here for actions taken in other states and manufacturing plants in other countries. I've cited to the court the central GMC case, and the court there was faced with a very similar kind of argument, and that was that there was a termination when GMC stopped the manufacture of some of the trucks that were covered under the GMC dealer agreement. And the court said that we're not going to construe that as the termination of an agreement because if we did so, then it would implicate the Dormant Commerce Clause, and franchising is not a risk-free matter for either the franchisor or the dealer. Counsel, suppose we were to agree with your jurisdiction argument. Can a plaintiff go back to the review board for a good cause determination, or has that remedy been waived by the voluntary dismissal? It has been waived by the voluntary dismissal and the passing of time because there is a very specific time limit within which a protest must be lodged. They met that time limit from the October 14th letter. They ran in and filed their protest, but then Mr. Smith decided he wanted to pursue damages as his remedy. My time is just about up. There is a claim for wrongful amendment of the dealer agreement. I just don't see how there can be any claim for wrongful amendment if what we offered to them in between these versions of the complaint was an extension of the very same agreement. Similarly, if there in fact was a termination, which violates the post-May 22nd, 2009 statute that took away 4D60, the dealers went and got that taken out of the statute, then that, we believe, would constitute an infringement of the contract. Thank you, Your Honor. Thank you, Your Honor. Some of the key salient facts that counsel referred to having to do with Sterling making this October 14th announcement is a bit misleading. It was not Sterling that made that October 14th announcement. It was the mother company, DTNA, that was making that announcement. We referred to the contractual provision of allowing Sterling to cease the production of various models of trucks or any and all trucks, but the franchise agreement provision that he's referring to there is clearly limited by the Motor Vehicle Franchise Act, and even the franchise or the sales and service agreement incorporates Illinois law. So that limitation applies and does not give them an out in this case. Jurisdiction seems to be a source of some concern and questioning. The definition of good cause is in the Motor Vehicle Franchise Act. It refers to commercial reasonableness. It does not refer to this 12D lawyer list that was something of a limitation in the Fields case. And circuit courts determine good cause as a matter of course under the Uniform Commercial Code, matters of commercial reasonableness are something that courts are empowered to and do interpret and do rule on and have jurisdiction to rule on. So it's not a separation of powers issue involving public interest, as was the case in Fields. What we have here is the 2V good cause definition that I believe is appropriately interpreted would give the circuit court good cause. Justice Turner, you asked about whether or not there was jurisdiction before the Motor Vehicle Review Board. That dismissal was without prejudice, and I think there's some disagreement in the briefs in terms of whether or not the time period has passed with regard to the statute of limitations. We assert that it hasn't based on I think it's Section 14 of the Motor Vehicle Review Act gives four years rather than the 30-day limitation. So if a dealer is going to seek damages, as is the case here, clearly Section 13 says you go to circuit court and you can't go to the Motor Vehicle Review Board. We did go there. There was an objection about the damages, and we sort of took counsel's suggestion that maybe the circuit court had actual jurisdiction to award damages. So that dismissal was without prejudice. It's our position that the counts here, the 12 counts that were dismissed, valid causes of action should be reinstated and ask that this court reverse and remand this case. There were two counts not dismissed, correct? And those involved the adjunct company having to do with parts, and so that matter is still there below. Thank you. Thank you, counsel. We'll take this matter under advice.